## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DALLAS SAFARI CLUB                )
137009 Gamma Road                 )
Dallas, TX 75244                  )
                                  )
NAMIBIAN MINISTRY OF              )
ENVIRONMENT AND TOURISM           )
Phillip Troskie Building          )
P.O. Box 13306                    )
Windhoek, Namibia                 )
                                  )
NAMIBIAN ASSOCIATION OF           )      Case No. 19-cv-3696
COMMUNITY BASED NATURAL           )
RESOURCE MANAGEMENT               )
SUPPORT ORGANISATIONS             )
19 Lossen Street, P.O. Box 98353  )
Windhoek, Namibia                 )
                                  )
MILTON KARL EVANS                 )
2926 Old Boyce Road               )
Waxahachi, Texas 75165            )
                                  )
STEVE REEVES                      )
5175 South 5825                   )
West Hooper, Utah 84315           )
                                  )
ANTHONY ROGERS                    )
5527 W. Amherst Avenue            )
Dallas, Texas 75209               )
                                  )
ATLAS CHEEK, III                  )
3552 Golfing Green Drive          )
Branch, Texas 75234               )
                                  )
DANIEL CRIPPEN                    )
605 Kenmare Drive                 )
Burr Ridge, Illinois 60527        )
                                  )
DAVID CRIPPEN                     )
703 Pine Street                   )
Andover, Illinois 61233           )

BRYAN OTTMERS                          )
503 Kendall Parkway                    )
Boerne, Texas 78015                    )
                                       )
JOE EASTER                             )
P.O. Box C.R. 178                      )
Gainesville, Texas 76241               )
                                       )
JOHN WEAVER, III                       )
16511 McLennan Road                    )
Troy, Texas 76579                      )
                                       )
ARLENE HANSON                          )
42419 N. Sierra Vista Road             )
Cave Creek, Arizona 95331              )
                                       )
ERNEST J. LINDO, JR.                   )
3279 South Mills Road                  )
Gustine, CA 95322                      )
                                       )
MARK PIRKLE                            )
1224 Country Road 147                  )
Blanket, TX 76432                      )
                                       )
MARK SAUSBURY                          )
#18 Mansion Oaks Dr.                   )
Odessa, TX 79765                       )
                                       )
                    **PLAINTIFFS**     )
                                       )
                 v.                    )
                                       )
DAVID BERNHARDT,                       )
Secretary of the Interior,             )
U.S. Department of the Interior        )
1849 C Street NW                       )
Washington, DC 20240                   )
                                       )
MARGARET EVERSON,                      )
Director (Acting)                      )
U.S. FISH AND WILDLIFE SERVICE  )
1849 C Street NW                       )
Washington, DC 20240                   )

|                                           |     |
|-------------------------------------------|-----|
|                                           | )   |
| UNITED STATES FISH &WILDLIFE              | )   |
| SERVICE                                   | )   |
| 1849 C Street NW                          | )   |
| Washington, DC 20240                      | )   |
|                                           | )   |
| **DEFENDANTS**                            | )   |

# *COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF*

## I.    **INTRODUCTION.**

1.      Defendants administer the underlying determinations and issuance of all elephant import permits required under the Endangered Species Act, 16 U.S.C. §1531 et seq. ("ESA") and the Convention on International Trade in Endangered Species of Wild Fauna and Flora (March 3, 1973), 27 U.S.T. 1087 (hereinafter "CITES").[1] Contrary to their own rules, regulations, legal and occupational duties, scientific findings and past practices, Defendants are illegally no longer processing elephant import permits applications for any country. Those permits are the linchpin of the elephant conservation strategy for the whole of Southern Africa and parts of East Africa which are the stronghold of the largest remaining African elephant population.

2.      The African elephant population of Botswana, Mozambique, Namibia, South Africa ("RSA"), Tanzania, Zambia and Zimbabwe – where legal, regulated hunting of elephant are permitted – represent 82 percent of the African continent's total elephant population. *See* Thoules, et al., African Elephant Status Report 2016, Occasional Paper Series of the IUCN, SSC. No. 60 IUCN/SSC/AFESG, 339.  Those elephant populations

---

[1] 16 U.S.C. §1538(c)(1) incorporates CITES into U.S. domestic law through the ESA.

are stable, growing or exceed habitat carrying capacity largely because of the legal regulated hunting that depends upon the import permits Defendants are unlawfully not processing.

3.     Prior to the unlawful "hold" at issue here, legal, regulated hunting provided approximately 55 to 70 percent of the revenue for the rural community programs. *See, e.g.,* Zimbabwe CAMPFIRE Association, The Role Of Trophy Hunting Of Elephant In The Support Of The Campfire Program (December 2016) (hereinafter "CAMPFIRE"); Naidoo, Complementary Benefits Of Tourism And Hunting To Communal Conservancies In Namibia, 30 *Conservation Biology*, 628 (October 2015). Legal, regulated elephant hunting provides the primary revenue for  many millions of rural poor Africans. *See* CAMPFIRE, (supporting Zimbabwe 777,000 households averaging seven persons each in Zimbabwe). Some 180,000 persons in 82 communal conservancies are supported by elephant hunting in Namibia. *See* NASCO 2015 Annual Report, The State Of Community Conservation In Namibia ("hereinafter NASCO 2015 Annual Report").

4.     Legal, regulated elephant hunting is vital to the continued survival of the African elephant that Defendants are duty bound to recover and secure. Elephant in the CAMPFIRE communal area of Zimbabwe have more than "doubled" and in the communal conservancies in Namibia have more than "tripled" because of the elephant hunting conservation strategy. *See* Child, Natural Resource Management By The People, Zimbabwe's CAMPFIRE Programme, IUCN-ROSA Environmental Issue No.2, p. 28; NACSO 2015 Annual Report.

4

## II.     VENUE AND JURISDICTION.

5.      Jurisdiction is conferred by 28 U.S.C.§1331 (federal question) and 5 U.S.C. §702, §706 (judicial review of agency action and inaction); 28 U.S.C. §2201, §2202 (Declaratory Judgement Act); 16 U.S.C. §1540 (c) and (g) (Endangered Species Act); and 42 U.S.C. §1983 (Constitutional rights of permit applicants).

6.      Venue is proper in this district under 28 U.S.C. §1391 and 5 U.S.C. §703.

7.      On September 6, 2019, more than 60 days before the filing of this complaint, Plaintiffs provided Federal Defendants written notice of the violations that are the subject of this lawsuit in accordance with 16 U.S.C. §1540(g)(2)(c).  The notice is attached as Exhibit 1 and is incorporated herein by reference.  Defendants have not responded to this notice nor taken any action to withdraw the action (actually inaction pursuant to Presidential tweets) at issue here, or to otherwise remedy their violations of law.

## III.    THE PARTIES.

### A.     Plaintiffs.

**5.**      Dallas Safari Club ("DSC") is a non-profit conservation organization with its principal place of business at 13709 Gamma Road, Dallas, TX 75244.  DSC is a "person" within the meaning of 5 USC §551(2). The organization's logo is the African elephant and it has invested millions of dollars in African elephant conservation. DSC appears herein on its own behalf and on behalf of its many recreational and commercial members that depend upon a healthy, robust elephant population and abundant elephant habitat in Africa. The DSC also has a memorandum of understanding ("MOU") with the Government of Namibia

through its Ministry of Environment and Tourism ("MET") on "Cooperation In The Field Of Wildlife Conservation" including "Namibia's conservation hunting programme."

6.      Plaintiff Namibian Ministry of Environment and Tourism ("MET") is the elephant management government wildlife authority for Namibia. The mission of the MET is to promote biodiversity conservation in the Namibian environment through the sustainable utilization of natural resources and tourism development for the maximum social and economic benefit of its citizens. It is the department of government that secures and protects elephant, establishes the wildlife policy, sets the elephant quotas, issues the hunting permits and the hunting trophy export permits, and is constitutionally duty bound to conserve the species.

7.      At independence in 1990, the new Government of Namibia recognized the importance of the environment, by including the protection of natural resources in its Constitution. Namibia has one of the few constitutions in the world with specific provisions aimed at safeguarding the environment. Furthermore, Namibia is one of the few countries that has linked issues of environmental protection to tourism development, including tourist safari hunting.

8.      Namibia has achieved significant conservation successes and now has the largest population of Black Rhinoceros in Africa, the only significant population of this species outside protected areas, expanded lion and giraffe populations outside protected areas, and boasts an elephant population that has increased from 7000 to 23000 in 19 years, all owing to its communal conservancy program. In addition, the Ministry, through establishment of community conservancies under the auspices of its Community Based

Natural Resource Program, benefits rural communities through infrastructure development, employment creation and income. Furthermore, through conservation of bio-diversity, tourists from across the globe are attracted to Namibia's beautiful landscapes, contributing significantly to economic growth of the country as well as expanding elephant populations.

9.     The MET processes and grants permits for the hunting of game animals in Namibia, particularly permits to hunt and export elephant.  MET also awards tourism and hunting concessions, and licenses the professional hunters that conduct all safari hunting.

10.    Plaintiff Namibian Association of Community Based Natural Resource Management Support Organisations ("NACSO") is a voluntary association of community-based resource management organization, with the aim of promoting, supporting and furthering the development of community-based approaches to the wise and sustainable management of Namibian natural resources, thereby striving to advance rural development and livelihoods, to promote biodiversity conservation, and to empower communities through capacity building and good governance. It was formed to represent and serve the 82 communal conservancies of 180,000 persons.

11.    The purpose of NACSO is to provide quality services to the various rural communal conservancies seeking to manage and utilize their natural resources in a sustainable manner. Most communal conservancies in Namibia would be unable to cover their operating costs without the regulated tourist safari hunting revenue.  Conservancies unable to cover their operating costs will likely cease to pursue conservation as a viable land use without the conservancy income. Game guards cannot be paid. Management and

monitoring plans cannot be developed and instituted. The sense of local ownership over natural resources dissipates and wildlife becomes much more vulnerable to declines from poaching and overharvesting. Almost 80 percent of hunting benefits are delivered by two species (elephant and buffalo) and elephant alone generate more than 55 percent of all hunting benefits. Moreover, 28 of the conservancies derived all or almost all of their total benefits from hunting. *See* Naidoo, Complementary Benefits Of Tourism And Hunting To Communal Conservancies In Namibia, 30 *Conservation Biology* at 632, 634-36.

12. The Community-based Natural Resource Management Program of Namibia ("CBNRM") is one of the world's leading examples of conservation and rural community empowerment through the devolution of rights and responsibilities over wildlife and other natural resources, including forests and indigenous plant species.  Under it, the elephant population has more than tripled.

13. In 2001 NACSO developed its first five-year strategic vision for CBNRM. It began with the Nye Nye Conservancy of the San People which still today largely depends upon hunting of the growing elephant population. The elephant  import permit applications of American hunters who have hunted Nye Nye Conservancy and other conservancies are not being processed by FWS, thus fewer and fewer hunters are booking hunts, which is injuring both the elephant population and the interdependent communal conservancy people.

14. The achievements and impacts of the program over the last two decades are impressive and inspiring. Rural communities have formed 86 communal conservancies, 32 community forests, and a community association living within national park boundaries.

8

Cumulatively, these areas cover almost 20 percent of Namibia's land, and engage and empower almost 10 percent of Namibia's population as conservation stewards. There the elephant population has more than tripled.

15. The success of the CBNRM program is based on two premises: (1) that communities wish to live with their natural heritage, including wildlife, and (2) that through the program, benefits accrue to local communities in the rural economy, linked to strong and sustainable wildlife populations. Despite the impressive gains that have been made in Namibia's community-based conservation, and the global recognition that has ensued as a result, studies have shown that most conservancies will shortly fail if elephant import permits are not processed. Much of the work of these community organizations are funded through revenue from tourist safari elephant hunting. *See* Naidoo, Complementary Benefits Of Tourism And Hunting To Communal Conservancies In Namibia, 30 *Conservation Biology*. Moreover, surveys have shown that without the elephant imports, the elephants will no longer be tolerated. *See, e.g.,* Angula et al., Local Perceptions Of Trophy Hunting Of Elephant On Communal Land In Namibia, 218 *Biological Conservation* (2018).

16. Plaintiff Milton Karl Evans is a member of DSC. On May 10, 2018, he filed an application for an elephant import permit for a planned May 2018 hunt in Zimbabwe. PRT 93406C. Like other members of DSC he did not take an elephant because he did not have a FWS import permit and is awaiting a permit to consummate his elephant hunt. On information and belief Defendant United States Fish & Wildlife Service ("FWS") is unlawfully not processing his application because of circumstances discussed below.

17.     Plaintiff Steve Reeves is a member of DSC.  On March 7, 2018 he filed an application for an elephant import permit for an elephant hunt in Zimbabwe in which he participated during April of 2018, PRT 84788C.  On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

18.     Plaintiff Anthony Rogers on January 11, 2017 filed an application for an elephant import permit for a hunt in Zimbabwe in which he participated during July and August of 2017, MA18507C-0.  On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

19.     Plaintiff Atlas Creek, III is a member of DSC.  On April 18, 2017, he filed an application for an elephant import permit for a hunt in Zimbabwe in which he participated during June of 2014, PRT MA33591C.  On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

20.     Plaintiff Daniel Crippen is a member of the DSC.  On September 25, 2017, he filed an application for an elephant import permit for a hunt in Zimbabwe in which he participated during August of 2017, PRT US58155C. On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

21.     Plaintiff David Crippen on September 25, 2017, he filed an application for an elephant import permit for  a hunt in Zimbabwe in which he participated during August

of 2017, PRT MA57769C-0.  On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

22.     Plaintiff Bryan Ottmers is a member of DSC.  On  March 19, 2018, he filed an elephant import permit application for a hunt in Zimbabwe in which he participated during August of 2015, PRT MA85343C. On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

23.     Plaintiff Joe Easter is a member of  DSC.  On September 7, 2016, he filed an application for an elephant import permit for a hunt in Zimbabwe in which he participated during August of 2017, PRT  06118C.  On  information and  belief Defendant FWS  is unlawfully not processing that application because of circumstances discussed below.

24.     Plaintiff John Weaver, III, on June 28, 2019, filed an application for an elephant import permit for a hunt in Namibia in which he participated during August and September of 2019, PRT MA48117D. On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

25.     Plaintiff Arlene Hanson has pending an application for an elephant import permit for a hunt in Zimbabwe in which she participated during September of 2016, PRT 033669C/9.  On November 7, 2019, a FWS staff biologist confirmed that the Hanson application was on file and specifically stated, "Our branch chief has all of the sport-hunted elephant import applications and is awaiting administrative approval to move forward on any decisions." Thus, the staff member confirms, as have others, that all elephant sport-hunted applications are on "hold" and the FWS Permits Branch is prohibited from

processing those applications at this time. *See also* Exhibit 2, hereto, Declaration of Rachel Ruth Brechbuehler.

26.     Plaintiff Ernest J. Lindo, Jr. on June 7, 2019, filed an application for an elephant import permit from a hunt in Namibia, PRT MA46999D.  On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

27.     Plaintiff Mark Saulsbury on March 5, 2018**,** filed an application for an elephant import permit for an August 2017 hunt in Nye Nye Conservancy, Namibia, PRT 83103C. On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

28.     Plaintiff Mark Pirkle on June 20, 2019, filed an application for an elephant import permit from a hunt scheduled for September/October of 2019 in Namibia, PRT 51200D.  On information and belief Defendant FWS is unlawfully not processing that application because of circumstances discussed below.

**B.     Defendants.**

**29.**     Defendant David Bernhardt is the Secretary of the Department of Interior ("DOI") and is being sued in that official capacity. The Secretary has ultimate authority over Defendant FWS and the administration of the import permit application processing that is unlawfully being withheld.

30.     Defendant Margaret Everson is the Principal Deputy Director of the FWS and serving as the Acting Director of  FWS.  She is sued in her official capacity as the

highest ranking official within FWS. She oversees the import permit application processing that is unlawfully being withheld.

31.    Defendant FWS is a bureau of Defendant DOI charged with administering the processing of ESA and CITES elephant import permits in compliance with the Administrative Procedures Act, 5 U.S.C. § 553, et seq. ("APA") and its published, duly adopted regulations.

## IV.    FACTS.

32.    FWS is not processing African elephant import permit applications for any country because of an illegal "hold" resulting from Presidential tweets.

33.    Upon receipt of an application for an elephant import permit from any and all countries, FWS assigns the application a number and sends a written acknowledgement of receipt of the application but stops at that point. FWS does not currently process any elephant import permit applications. The agency does not initiate the import permit processing steps in its Service Procedural Manual or its regulations in the Code of Federal Regulations ("CFR").[2]

---

[2] The issuance of permits is not an action committed to agency discretion.  50 C.F.R. §13.21(b), Issuance of permits, mandates:

   (b)    Upon receipt of a properly executed application for a permit, the Director *shall issue the appropriate permit unless...*

      (4)    the authorization requested potentially threatens a wildlife or plant population.

(Emphasis added).   In the case of renewal permits, 50 CFR §13.22(b), Renewal of Permits, specifically provides:

34.     When contacted about the status of elephant import applications, the assigned FWS personnel state they have been ordered not to process those permit applications and there is nothing they can do; and they cite to the President's "hold" of November 2017.

35.      The "hold" has also prevented the processing of applications to renew pre-existing import permits and minor amendments to those permits.

36.     Because no elephant import permit applications are being processed, they are also not being denied; hence, the applicants are also being denied their rights to an administrative appeal and to judicial review remedies from such administrative appeal.

37.     Appeal procedures are set forth at 50 C.F.R §13.29 and contain strict time limits for seeking review and for agency action. An applicant that has received a denial of a permit may petition for reconsideration of that denial within 45 calendar days of the date of notification of the denial. 50 C.F.R. §13.29(b)(2). FWS then has 45 days from receipt of the petition for reconsideration to rule on the petition. 50 C.F.R. §13.29(d). The applicant may then seek review of the decision by filing a written appeal within 45 days of the denial of the petition for reconsideration. 50 C.F.R. §13.29(e). FWS "shall notify the appellant in writing of its decision within 45 calendar days of receipt of the appeal, unless extended for good cause and the appellant [is] notified of the extension."

---

(b)     Renewal Criteria. ***The Service shall issue a renewal*** of a permit if the applicant meets the criteria for issuance in §13.21(b) and is not disqualified under §13.22(c).

(Emphasis added).

14

A.      The African Elephant.

38.      All African elephant are listed as threatened on the ESA list because they are at risk of becoming endangered in a "significant part of their range," not necessarily at risk in         all         of         their         range         or         countries.         *See* https://ecos.fws.gov/ecp0/profile/speciesProfile?sId=7724.  All but one of the populations in which elephant have been importable continue to be stable or increasing. In Botswana, Namibia, Zambia, and the RSA elephants are increasing. *See* African Elephant Data Base, IUCN AFESG, available at www.elephantdatabase.org. In Zimbabwe there is a marginal decline due to human density but there is an excessive, above carrying capacity population of elephant in the country's primary areas. *See* Zimbabwe National Elephant Action Plan (2016),      available      at      https://zimparks.org/wp-content/uploads/2015/10/Zimbabwe-Elephant-management-plan-approved-final.pdf. Tanzania had significant decline on or about 2011 due to illegal poaching that was similarly experienced throughout the elephants' current range, but the elephant population is once again stable and/or increasing. *See* African Elephant Data Base, *supra*. Tanzania remains the country with the third largest African elephant population. *Id.*

39.      All African elephants are listed on CITES. Most are listed on Appendix I[3] of CITES, but Botswana,  Zimbabwe,  RSA, and Namibia have been down-listed to Appendix

---

[3] Appendix I lists species that are "threatened with extinction which are or may be affected by trade."  CITES art. II(1), 27 U.S.T. 1087, 1092.

II[4] with an annotation that they are to be treated as Appendix II for regulated hunting trade (and other negligible purposes, excluding commercial trade), but are to be treated as Appendix I for all other purposes. CITES, Appendix II & n.2.  The substance of the delisting from Appendix I recognizes that elephant in those four countries are not at Appendix I level risk and the positive conservation value arising from lawful, regulated trade is warranted and desirable.

40.     Those on Appendix II of CITES do not require CITES  import permits and therefore the underlying non-detriment finding by the FWS. Tanzania and Zambia remain on Appendix I, thus requiring the FWS's Division of Scientific Authority ("DSA") to make a finding that the purpose of the import is not detrimental before the Permits Office of the Division of Management Authority ("DMA") can issue an import permit. The DSA is not endeavoring to make non-detriment findings for the Appendix I listed elephant for import applications from Tanzania and Zambia as required. The other countries at issue, Botswana, Zimbabwe, RSA, and Namibia do not require a DSA determination but do need an ESA enhancement finding.

41.     Because all elephant are listed as threatened on the ESA, all do require a FWS import permit regardless of their CITES listing. *See Safari Club v. Zinke,* 878 F.3d at 322.  By special regulation, FWS requires proof that the hunting "enhances" the survival of the species before an import permit can be issued. 50 C.F.R. §17.40(e)(6)(i)(B). The FWS's Permits Office is knowingly and intentionally not making those findings or

---

[4] Appendix II lists species that may become threatened with extinction unless their trade is regulated. *Id.* art. II(2), 27 U.S.T. at 1092.

otherwise processing the import permit applications for any country. The permitting is on

"hold" in contravention of the agency's Service Manual (*see* 230 FW 6, at 2,  530 FW 1 at

I. (1), 022 FW 7 .1 (requiring FWS to make sound and timely decisions processing permit

applications)), and the Code of Federal Regulations governing permitting (*see* 50 C.F.R.

13.21 ("Upon receipt of a properly executed application for a permit, the Director shall

issue the appropriate permit....")).  *See also* 50 C.F.R. §17.1 et seq., and the special

regulation for elephant, 50 C.F.R. §17.40(e)(6)(i)(B), discussed in detail below.

42.     It cannot be seriously denied that the FWS has scientifically determined that

regulated hunting enhances the survival and recovery of the elephant in the respective

countries and would do so now in most if not all cases but for the 'hold." *See, e.g.,* Issuance

of Import Permits for Zimbabwe Elephant Trophies Taken On Or After January 21, 2016,

And On Or Before December 31, 2018, 82 F.R. 54405 (enhancement finding for

Zimbabwe). The very enhancement that FWS has documented for decades has been

disrupted by the failure and refusal of FWS to process currently pending elephant import

permit applications. The failure to process elephant import permit applications is denying

the substantial benefits that the FWS has documented for decades. Defendants cannot deny

their own enhancement findings so plaintiffs will not elaborate on the volumes of benefits

the import permitting has provided which is now being denied. The illegality of the

failure/refusal to process the permit application is the issue.

**B.     Chronology of the "Hold."**

43.     In the Spring of 2014, FWS suspended its CITES non-detriment and ESA

enhancement findings for Tanzania and ESA enhancement finding for Zimbabwe. *See*

Enhancement Finding for African Elephant Taken as Sport-Hunted Trophies In Tanzania

During 2014 (March 27, 2014) ("2014 Tanzania Enhancement Finding"); 79 FR 26986

(May 12, 2014) (Zimbabwe). *See also Safari Club v. Zinke,* 878 F.3d at 320. Thus FWS

"suspended" the issuance of elephant import permits from those two countries. *Id.* It was

discovered that Tanzania had lost more than half of its elephant to poaching (unlawful

black-market commercial trade). Tanzania Enhancement Finding, at 11-13. Zimbabwe had

been a model elephant management country, but its national elephant management plan

was out-of-date and FWS wanted a more up-to-date and comprehensive national survey of

its elephant population because of a rumored poaching level that later proved to be untrue.

79 F.R. at 26987.

      44.    It is important to note that FWS made the point that

> Legal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much needed revenue back into conservation. At this time, the Service does not have conservation concerns with African elephant sport hunting in Namibia, South Africa, or Botswana….

Press Release, *Service Suspends Import of Elephant Trophies from Tanzania and Zimbabwe* (April 4, 2014), available at https://www.fws.gov/news/ShowNews.cfm?ID=2E6FF2A2-E10F-82BC-DAE08807810E3C6B.

45.     The suspensions were made without warning or consultation with Tanzania or Zimbabwe's wildlife authorities or others.[5] There was no rule making publication and comment period. Had there been notice and inter-governmental consultation, Zimbabwe should not have been suspended because

> the most significant aspect of [FWS's] analysis is the lack of recent data on what is occurring in Zimbabwe... The Service will attempt to reestablish better communication with Zimbabwe and look to partners, NGOs, and other entities in an effort to gather additional information to support a positive finding...Until such information can be obtained the Service is unable to make the positive finding required under the ESA and will not allow the import of sport-hunted elephant trophies....

Chief, Branch of Permits, FWS Memorandum: Enhancement Finding for African Elephants Taken As Sport-hunted Trophies In Zimbabwe During 2014 (Summary, last paragraph).

46.     In March of 2015, despite receiving additional information from Zimbabwe, FWS continued the suspension of elephant imports from that country. 80 FR 42524 (July 17, 2015).

47.     After Zimbabwe learned of the suspension of the positive enhancement finding and consequential discontinuance of imports it had always enjoyed without interruption, its wildlife authorities began identifying the FWS information and management issues and addressing them. *See* 82 F.R. 54405, 54406-07 (November 17, 2017).

---

[5] CITES resolution 6.7 "Recommends that each Party intending to take stricter domestic measures pursuant to Article XIV, paragraph 1, of the Convention regarding trade in specimens of non-indigenous species included in the Appendices make every reasonable effort to notify the range States of the species of such measures, and consult with those range States that express a wish to confer on the matter.

48.     Most of FWS concerns resulted from errors and false reports of third parties. FWS misunderstood the incompletely updated African Elephant Data Base of The International Union for Conservation of Nature's African Elephant Specialist Group ("IUCN") that did not include all of Zimbabwe's elephant population surveys. Zimbabwe had not suffered a catastrophic elephant decline as misrepresented, an alleged decline from 84,416 in 2007 down to 47,366  in 2013. *See* 82 F.R. at 54406. The alleged poaching of more than 300 elephant in a single poisoning incident proved to be actually 105 in an area above carrying capacity, and the poachers had been apprehended and were sentenced to up to 16 years of confinement. Chief of Permits, FWS Memorandum: Enhancement Finding For African Elephants Taken As Sport-Hunted Trophies In Zimbabwe On Or After January 1, 2015 (March 26, 2015), at 7 & 11 (discussion of FWS erroneous interpretation of population data regarding poaching reports.)

49.     A comprehensive national elephant population survey documented that the elephant population was the second largest in Africa, with more than 83,000. 82 F.R. at 54406.  The largest share of those elephant were secure, above management objective and biological carrying capacity while a smaller minute population was found declining because "there has  been intense human settlement and the clearance of natural vegetation" to any longer support a larger elephant population. *See* Dunham, National Summary Of Aerial Results For Elephant in Zimbabwe (2014), at 1 (Introduction); African Elephant Data Base, *supra.*

50.     Zimbabwe demonstrated it had stepped up efforts to prevent poaching and stated that 80 percent of the spending under its Elephant Management Plan was directed to

law enforcement (anti-poaching) and training, with law enforcement as the top priority going forward.  82 F.R. at 54407.

51.    FWS and Zimbabwe corresponded back and forth until FWS was satisfied with the level of benefits from the underlying legal, regulated hunting program and the level of management was sufficient to meet the mandated enhancement standard. *See generally* 82 F.R. 54405.

52.    By November 2017, FWS was satisfied with the current data that benefits from legal, regulated hunting met the enhancement standard of the ESA. The Chief of the Branch of Permits announced the pending positive finding to Zimbabwe authorities along with other representatives of other sympathetic African governments and non-government organizations ("NGOs") at a meeting in Arusha, Tanzania, Africa.  FWS announcement at African Consultative Conservation Forum ("AWCP Announcement").  *See also* 82 F.R. 54405.  He also announced an enhancement finding had been made for Zambia, a country that had not been suspended, but had been closed of its own volition and had reopened seeking safari hunting imports. *See* AWCF Announcement.

53.    The Chief of Branch of Permits was accompanied by the Ranking Deputy Director of FWS and the Acting Director. The Chief of Permits announced that the lifting of the Zimbabwe suspension would have to be published in the Federal Register before being effective and that was to occur within a few days. Oral announcement confirmed by Federal Register Notice, 82 F.R. 54405 (November 17, 2017).

54.    On November 17, 2017, FWS published a Federal Register Notice announcing that Zimbabwe elephants taken on or after January 21, 2016, the date the

Zimbabwe National Elephant Management Plan had been signed by the Zimbabwe Minister, "have met the enhancement requirement" necessary for import. *See* Issuance of Import Permits for Zimbabwe Elephant Trophies Taken On Or After January 21, 2016, And On Or Before December 31, 2018, 82 F.R.54405.

55.     FWS made two written commitments in that Notice. The first was that it would "reevaluate the status of the African elephants in Zimbabwe before the end of 2018 and make a new finding (enhancement) in the beginning of 2019 for, at least the 2019 hunting season," 82 F.R. at 54408. Second, it represented that "the Service will review each application received for import of such specimens on a case-by-case basis." 82 F.R. at 54407. FWS also stated that "each application also needs to meet all other applicable permitting requirements before it may be authorized. *Id.* Contrary to that Notice, to date FWS has done neither because of the illegal "hold" that is the subject of this complaint.

56.     The news of the lifting of Zimbabwe's suspension reached the US media and anti-hunting organizations during the night in Africa and before the Chief of Permits, who made the determination, and the Acting Director of FWS  had returned to the United States. It also coincided with the President of Zimbabwe being ousted by the army and Vice President of the country.

57.     The  presidential transition in Zimbabwe was relatively smooth and widely considered desirable. In any event, Zimbabwe's wildlife management is administered by a parastatal, ZimParks, that by design operates independently of the government. *See* Zimbabwe Parks and Wildlife Management Authority at http.://ZIMParks.org. ZimParks operates on hunting fees, not revenue from the national government, but anti-hunting

special interests and the media attacked the administration for the enhancement finding made by FWS, the expert agency, and its timing with the unforeseen change in the Zimbabwe presidency. *See, e.g.,* https://www.politico.com/story/2017/11/17/trump-hunting-trophy-ban-elephants-247669.

58.     The decision to lift the suspension on elephant imports gathered substantial criticism in the media. *See Id.*  In the absence of the FWS Chief of Permits, who was the "contact" on the November 17, 2017 published notice, 82 F.R. 54405, and the Acting Director, who were in Africa at the Arusha AWCF meeting to explain the regulations, facts and sound science behind the import decision, at 4:47 pm EST, Friday, November 17, 2017, the President tweeted: "Put big game trophy decision on hold until such time as I review all conservation facts. Under study for years. Will update soon with Secretary Zinke. Thank You!" Then on Sunday, November 19, 2017,  the President  again tweeted:

> Big-game trophy hunting decision will be announced next week but will be very hard pressed to change my mind that this horror show in any way helps conservation of Elephants or any other animal.

59.     No elephant import permit from any country has been processed, issued or renewed since that first tweet on November 17, 2017. Though many import applications have been filed, no ESA enhancement nor CITES non-detriment determinations are being made. The applications are simply not being processed for a finding.

60.     No elephant range nation has been advised or consulted, no published rulemaking has been proposed or concluded, and the conservation benefits and species enhancement derived from the import permitting the FWS has long recognized and documented are on "hold" along with the import permits that require those findings. The

import permit applications are ignored and the applications never reach the point that the constructive denials can be appealed.

61.     The elephant range nation wildlife authorities, the rural community leadership associations, the conservation NGOs, the hunting operators and professional hunting associations, and most importantly the elephant that are dependent upon the revenue underlying the conservation infrastructure for control of poaching, protection of habitat, and rural community tolerance and stewardship are all being negatively impacted by the illegal "hold." The benefits being obstructed cannot be denied because the decades of the science-based positive non-detriment and enhancement findings of the agency's experts speak for themselves.

### C.    Second Development.

63.     In litigation arising from the negative Zimbabwe import enhancement finding and import suspension of 2014, the D.C. Circuit Court of Appeal in *Safari Club Int'l v. Zinke*, 878 F.3d 316 (D.C. Cir. 2017), held that the prospective, country-wide enhancement findings legally require a full published and commented upon rulemaking proceeding.

64.     Pursuant to the D.C. Circuit opinion, on March 1, 2018, FWS withdrew all past enhancement findings for Zimbabwe and Tanzania elephant. It also withdrew all other ESA enhancement and CITES non-detriment findings for all other import permits that had been made on a countrywide basis without a full rulemaking. The withdrawal included the ESA enhancement findings for elephant imports from the RSA, Zambia, Botswana, and Namibia, as well as the CITES non-detriment findings for Tanzania and Zimbabwe. The

withdrawal was of both negative and positive findings that had not followed the full formal rule making procedure. In the memorandum of the withdrawals, FWS expressly stated that it intended to process applications for elephant import permits on a case-by-case basis, but it has nonetheless failed to process elephant import permits at all. *See* Withdrawal Of Certain Findings For ESA-listed Species Taken As Sport Hunted Trophies (March 1, 2018), available at fws.gov/international/pdf/memo-withdrawal-of-certain-findings-ESA-listed-species-sport-hunted-trophies.pdf. FWS also promised to make a new finding for Zimbabwe elephant import permits on a case by case basis before the end of 2018 "for, at the least, the 2019 hunting season." 82 F.R. 54405, at 54408. It has failed to make that finding because of the illegal "hold."

65.    Thereafter, FWS procedurally began making its enhancement and non-detriment determinations for import permit applications on a "case by case" basis as individual application adjudications, rather than prospectively range-wide for all other species except for elephant that are on this informal and illegal "hold."

66.    Because of the "hold" complained of above, the CITES non-detriment and ESA enhancement findings are not being made for any elephant exporting country, while all other species permitting is being made following the case by case adjudication procedure. No import permit can be issued or denied without first making the related enhancement and/or non-detriment finding. No elephant import permitting is being conducted, even for elephant hunted/taken before the date of the "hold."

## V.    STANDING.

67.    Each of the individual plaintiffs have standing to maintain this action. The Supreme Court set forth the requisites for standing in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992):  Plaintiffs must show an injury in fact, which means an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; Plaintiffs must show a causal relationship between the injury and the challenged conduct, which means that the injury can be traced to the challenged action of the defendant and has not resulted from the independent action of some third party not before the court; and Plaintiffs must show a likelihood that the injury will be redressed by a favorable decision, which means the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative.  *Id.*

68.    Each of the individual permit applicant Plaintiffs has filed an application with FWS for a permit to import the lawfully taken elephant products of their hunt. FWS is not processing those permit applications due to the "hold" FWS has put on elephant import permits following the President's tweets. The failure to process Plaintiffs' permit applications is an injury in fact of a legally cognizable and protected interest: that of having their applications processed pursuant to FWS rules that mandate that the FWS process those applications "as soon as possible." *See Parker v. District of Columbia,* 478 F3d 370, 375-76 D.C. Cir. 2007), aff'd *District of Columbia v. Heller,* 554 U.S. 570 (2008) (denial of application to register a handgun conferred standing on plaintiff to challenge District of Columbia's prohibition on registration of handguns).  There the court stated:

> We have consistently treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury. *See, e.g., Cassell v. F.C.C.*, 154 F.3d 478 (D.C.Cir.1998) (reviewing denial of license application to operate private land mobile radio service); *Wilkett v. I.C.C.*, 710 F.2d 861 (D.C.Cir.1983) (reviewing denial of application for expanded trucking license); *see also City of Bedford v. F.E.R.C.*, 718 F.2d 1164, 1168 (D.C.Cir.1983) (describing wrongful denial of a preliminary hydroelectric permit as an injury warranting review). The interests injured by an adverse licensing determination may be interests protected at common law, or they may be created by statute. And of course, a licensing decision can also trench upon constitutionally protected interests, *see, e.g., Dist. Intown Props. Ltd. P'ship v. District of Columbia,* 198 F.3d 874 (D.C.Cir.1999) (reviewing District of Columbia's denial of a building permit under the Takings Clause); *Berger v. Bd. of Psychologist Exam'rs*, 521 F.2d 1056 (D.C.Cir.1975) (reviewing District of Columbia's denial of a license to practice psychology under the Due Process Clause), which will also give rise to Article III injury.

*Id.* That the Plaintiffs' applications have not been denied, but are being indefinitely held, is immaterial. They have a right pursuant to the agency's rules to have their applications processed "as soon as possible" and that right is being denied while the agency holds their applications indefinitely without processing to decision. They also have rights under the APA to processing of their applications in a reasonable time that are being denied by the indefinite hold on their applications.

69.     The relief requested herein, inter alia, an order requiring FWS to process the import permit applications, will redress the injury of which Plaintiffs complain, i.e., the failure to process their applications. Hence, the individual Plaintiffs have met all three requisites for standing to bring this action.

70.     Likewise, Plaintiff Dallas Safari Club has standing. The DSC has invested millions of dollars in elephant conservation in Africa. The survival of the largest remaining population of elephant is dependent upon safari hunting. The DSC and safari hunting are

interdependent upon the survival of the elephant. The long term survival of the elephant being lawfully hunted by its members and others is a primary conservation objective of the DSC and its members. The benefits of safari hunting has long been recognized by FWS as shown by the decades of FWS's enhancement findings under the ESA and non-detriment findings under CITES. As discussed herein, the legal, regulated hunting of elephant contributes to conservation efforts and the survival of the species by providing necessary operating funds used by the counties with the largest population of elephant and relevant habitat to combat poaching, manage the population, and take various other actions essential to protect the elephant population from annihilation.  FWS's "hold" jeopardizes these benefits by discouraging legal, regulated hunting and thus threatens to deny conservation and management funds to the counties with the most successful and important conservation and rural community programs. This is a concrete injury to the conservation organization's efforts to protect the African elephant symbolized by its elephant logo and confirmed by its MOU with MET, that the relief requested herein will redress.  As such the DSC has standing in its own right to maintain this action.

71.     Further, as discussed above, individual members of the DSC, including individual Plaintiffs in this case, currently have filed – and more DSC members are expected in the future to file – applications for permits to import their lawfully acquired elephant safari hunting products. The DSC members want to go, intend to go, will go and are going elephant safari hunting in the hope of importing collectible elephant products of their hunt. They do not wish to hunt and pay the price of the hunt without importing the elephant memorabilia products. The DSC thus has representational standing to assert the

interests of its members who are subject to FWS's unlawful "hold" on the processing of their elephant import permit applications. *See  Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

72.    MET also has standing to challenge FWS's unlawful hold. MET is the wildlife regulatory agency of the Republic of Namibia for elephant conservation and conservation hunting. FWS's unlawful hold is impeding these critical MET functions. Legal, regulated hunting, including elephant safari hunting, largely finances MET's activities aimed at sustainably managing the country's wildlife in general and elephant specifically.  Namibia's elephant population has tripled in recent years in large part to the communal conservancies safari hunting framework MET established. That program largely depends upon the safari elephant hunting at issue here that MET calls "Conservation Hunting," which in turn depends upon the import permits FWS is not processing. The safari hunting adds to the value of the elephant to the local population; it makes the local population more tolerant of the growing density of the elephant, and thus increases the elephant habitat and helps secures them from poaching. FWS's "hold" is resulting in a diminution of elephant hunting applications with the resulting loss of revenue necessary for MET to carry out its Constitutionally mandated conservation responsibilities. This court's invalidation of the hold and an order requiring FWS to process elephant import applications will redress the injury MET suffers.

73.    Likewise, NACSO has standing to challenge FWS's unlawful "hold." Inasmuch as regulated tourist safari hunting of elephant is the source of the bulk of the funds necessary to support the 86 communal conservancies that are the object  of NACSO's

function, the FWS unlawful "hold" is injuring NACSO and the subjects of its existence. The court's invalidation of the "hold" and an order requiring FWS to process elephant import applications will redress the injury NACSO and the 86 communal conservancies it serves suffer.

## VI.    APPLICABLE LAW AND REGULATIONS.

### A.    The Endangered Species Act ("ESA").

74.    Through the ESA, 16 U.S.C. §§1531-1544, Congress established "a program for the conservation of such endangered species and threatened species," and mandated federal agencies to "utilize their authorities in furtherance of the purposes of" the ESA by committing "to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction...." 16 U.S.C. §1531(a)(4), (b) & (c)(1). The rule making and permitting authority Congress established is to the Secretary of the Interior, who has in turn delegated that authority to FWS, not to Presidential tweets.

75.    All African elephant are currently listed as threatened, not endangered, because FWS has found that they are "likely to become an endangered species within the foreseeable future through all or a significant portion of range." 16 U.S.C. §1532(20); 50 C.F.R. §17.11(h). The elephant at issue in this litigation were listed largely because of the precarious status of elephant in a "significant part of their range," not because of their actual status in the Southern and Eastern African countries at issue herein that have well developed conservation programs. FWS has repeatedly recognized that the elephant's long-term survival depends upon conservation strategies that the current "hold" jeopardizes.

76.     The ESA mandates the Secretary to adopt and implement a 4(d) rule for the necessary conservation of threatened listed species: "Whenever any species is listed as a threatened species ... the Secretary *shall* issue such regulations as he deems necessary and advisable to provide for the conservation of the species." 16 U.S.C. §1533(d) (emphasis added). Thus, FWS has adopted the special rule for elephant parts and derivative imports, 50 C.F.R. §17.40(e). The Secretary has adopted this rule for elephant but its implementation and the conservation for the species it is designed to provide are illegally on "hold" based solely on Presidential tweets.

77.     FWS regulations implementing the ESA permitting provide that the agency will process permit applications "as quickly as possible." 50 C.F.R. §13.11(c).[6] Moreover, the agency advises applicants for permits related to endangered or threatened species to ensure their applications are postmarked at least 90 days prior to the requested effective

---

[6] The regulation states in pertinent part:

> **(c)** *Time notice.* The Service will process all applications as quickly as possible. However, we cannot guarantee final action within the time limit you request. You should ensure that applications for permits for marine mammals and/or endangered and threatened species are postmarked at least 90 calendar days prior to the requested effective date....

The regulation goes on to say that the time required "for processing of endangered and threatened species incidental take permits will vary according to the project scope and significance of effects." *Id.* The regulation also cautions that "processing time may be increased by the procedural requirements of the National Environmental Policy Act (NEPA), the requirement to publish a notice in the Federal Register requesting a 30-day public comment period" for "certain types of permit applications, and/or the time required for extensive consultation within the Service, with other Federal agencies, and/or State or foreign governments." *Id.* None of those conditions exist with respect to the applications at issue in this action, and the agency has certainly not suggested that any of these conditions apply. Indeed, the agency has been officially mum on the "hold" apparently fully aware the "hold" is unlawful.

date. *Id.* A "hold" on processing such permits directly violates the agency's own rules. Agencies are bound by their rules. *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (U.S. 1954); *Community Nutrition Institute v. Young,* 818 F.2d 943 (D.C. Cir. 1987); *Reuters Limited v. FCC*, 781 F.2d 946 (D.C. Cir. 1985). Ad hoc departures from those rules, even to achieve laudable aims, cannot be sanctioned, *Teleprompter Cable Systems v. FCC*, 543 F.2d 1379, 1387 (D.C. Cir. 1976).[7] A rule requiring that the agency process these applications "as quickly as possible" at the very least means the agency must process them rather than place an indefinite "hold" on these applications. There is no justification for the failure to process these pending applications. Prior to the President's tweet, FWS announced it will process such applications on a case by case basis. Withdrawal Of Certain Findings For ESA-listed Species Taken As Sport-Hunted Trophies (March 1, 2018). There is no rulemaking proceeding pending looking to change the method of processing these applications, nor has the agency announced its intention to commence such a proceeding. The agency must follow its rules and process these pending applications forthwith.

**B.    Convention on Trade in Endangered Species ("CITES").**

78.    The United States is a party to CITES and thus bound by its provisions. The ESA mandates the Secretary shall "take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth...." 16 U.S.C. §1531(b). CITES Resolution 2.11 has provided for the trade of safari hunting trophies of Appendix I listed

---

[7] Here there is no laudable aim of the "hold;" Rather the hold results from an agency to whom Congress has directed responsibility for implementing the ESA caving into the President's announced distaste for elephant hunting, despite FWS's decades long record of documenting the benefits such hunting offers the long-term survival of the species.

game species since the second Conference of the Parties.  *See* Resolution Conf. 2.11, Trade in hunting trophies of species listed in Appendix I (March 1979), available at https://cites.org/sites/default/files/document/E-Res-02-11-R09.pdf.

79.     At the request of the RSA, Namibia, Zimbabwe, and Botswana, the parties have down-listed elephant from those counties to Appendix II to facilitate trade of parts and derivatives from elephant hunting. CITES, Appendix II, Note 2.  *See also* Changes In List Of Species In Appendices To The [CITES], 62 Fed. Reg. 44,627, 44,628-29 (Aug. 22, 1997*)* CITES has acknowledged that trade in those populations does not warrant import permitting restrictions and the trade can benefit the species. *See Safari Club Int'l  v. Zinke*, 878 F.3d at 321. Notwithstanding the downgrade to Appendix II, FWS regulations continue to require positive enhancement findings to support elephant import permits from these countries. *See Safari Club v. Zinke,* 878 F.3d at 322. FWS is thus required to make these findings in the course of processing permit applications.

C.     **The Administrative Procedures Act ("APA").**

80.     FWS's failure to process elephant import permit applications violates several provisions of the APA. The APA provides that agency action is unlawful where it is made "without observance of procedure required by law." 5 U.S.C. §706(2)(D).  The "hold" on processing permit applications is squarely in violation of this provision. FWS did not initiate any rulemaking prior to implementing the "hold." Indeed, FWS has made no official announcement of the "hold;" it has not been published in the Federal Register nor even documented with a press release. Applications simply sit and informal contact with agency personnel result in being advised that processing is on "hold."

81.     FWS's "hold" amounts to a legislative rule because it has "general or particular applicability and future effect designed to implement, interpret or prescribe law or policy." 5 USC §551(4).  *See Safari Club v. Zinke,* 878 F.3d at 334. Although the agency has stated that elephant import permits will be processed on a case by case basis, the "hold" is being applied to all pending elephant import applications. It is thus a legislative rule adopted without the required notice and comment rulemaking proceedings. *Safari Club v. Zinke,* 878 F.3d at 331-35.

82.     The APA *requires* that when an agency proposes to promulgate a rule it must publish a notice of proposed rulemaking in the Federal Register. 5 U.S.C. § 553(b). It must then give interested persons an opportunity to participate in the proceeding through the submission of comments which the agency must consider. *Id.* A final rule must contain a statement of its basis and purposes and be published in the Federal Register not less than 30 days before its effective date. *Id.* § 553(c) & (d). In adopting the indefinite "hold" following the President's tweets, FWS followed none of the processes Section 553 mandates. No notice of proposed rulemaking was issued. No comments were accepted or considered. No reasoned decision has been made supporting the "hold," much less publication in the Federal Register. Accordingly, the agency has acted contrary to lawful procedures and the "hold" may not stand. This court must order FWS to process the pending applications.

83.     The APA prohibits agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitation, or short of statutory right." 5 U.S.C. §706(2)(A), (B) & (C).  The ESA provides

by special rule for the import of elephant parts and derivatives subject to the agency finding

that the safari hunting of the animal will enhance the overall survival of the species. 50

C.F.R. §17.40(e)(6)(i)(B). The special rule obligates the agency to make an enhancement

finding in the course of processing permit applications. And the agency's rules require it

to process permit applications as quickly as possible. 50 C.F.R. §13.11(c). The "hold" is

plainly in violation of Section 706 because the agency has an affirmative obligation to

process permit applications and no authority to simply hold them without processing

because of a Presidential tweet.

84.     Indeed, the APA expressly provides that agency action, such as decisions on

permit applications, shall not be "unlawfully withheld or unreasonably delayed" and

authorizes a reviewing court to compel agency action unlawfully withheld or unreasonably

delayed. 5 U.S.C. §706(1).  Here FWS has offered no explanation for its indefinite "hold"

on processing elephant import permit applications. In fact, FWS has not even officially

acknowledged the "hold." Here FWS's "hold" is per se unreasonable since it has failed to

provide any reason or basis for its implementation.

85.     The APA authorizes a reviewing court to "hold unlawful and set aside agency

action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion

or otherwise not in accordance with law...." 5 U.S.C. §706. The APA  further provides that

the failure to act is itself agency action. 5 U.S.C. §706 (1); 5 U.S.C. §551 (13). The absence

of any explanation to support implementation of FWS's "hold" renders that action arbitrary

and capricious. *See FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (When

agency changes its position regarding a regulatory matter, it must "provide a reasoned

35

explanation for its action.") Indeed, the "hold" appears to be based solely on the President's tweets, notwithstanding the long demonstrated benefits of legal, regulated hunting toward conservation efforts that enhance the survival of the elephant population.

86.     APA Section 558(c) provides:

> When application is made for a license[8] required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision.

Courts generally give agencies wide discretion in terms of setting priorities in the absence of governing time limits. However, FWS has a governing rule that requires it to process applications for permits "as quickly as possible." 50 C.F.R §13.11(c). Moreover, FWS advises applicants to ensure their applications are postmarked at least 90 days in advance of the requested effective date. *Id.* That regulation at the very least implies that processing within 90 days is a reasonable time given the nature of the application. FWS's failure to process elephant import permit applications *at all,* without any explanation, in violation of its own rules, is plainly unlawful and must be set aside by this court.

87.     In *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004), the Supreme Court stated that "when an agency is compelled by law to act within a certain time period ... a court can compel the agency to act." The D.C. Circuit has also noted that

---

[8] APA Section 551(8) defines a license to include a permit: "'license' includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."

the wording of the APA indicates Congress intended the courts to play a role in ensuring that agencies fulfill their obligation to act within a reasonable time,[9] and other circuits have noted that a claim of unreasonable delay qualifies for judicial review despite a lack of "final agency action."[10] In determining the reasonableness of a delay in agency action, courts look to among other things whether there is a deadline for a decision. *See TRAC,* 750 F.2d at 80.

88.     The APA, Federal Register Act and the ESA all require notice and comment procedure to change special rule 4(d) and the regulations governing import permitting. 5 U.S.C. §553, 4 U.S.C. §150, 44 U.S.C. §§1501-1511, and 16 U.S.C. §1533(b)(5), respectively. No such rulemaking proceeding has been commenced or even prospectively discussed by the agency. The "hold" is plainly inconsistent with the elephant import special rule implementing the ESA, and the agency's own rules requiring the processing of applications "as quickly as possible" and the APA's requirement that the agency act on permit applications within a reasonable time. This court must therefore set aside the "hold" and require the agency to expeditiously process pending elephant permit applications.

## VII.   Claims for relief.

### Count 1.   Violation of 50 C.F.R. §13.11(c).

---

[9] *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 77–78 (D.C. Cir. 1984) ("TRAC") ("[S]ection 706(1) coupled with section 555(b) does indicate a congressional view that agencies should act within reasonable time frames and that courts designated by statute to review agency actions may play an important role in compelling agency action that has been improperly withheld or unreasonably delayed."). Section 555(b) states that agencies should conclude matters "within a reasonable time," and Section 706(1) states that courts "shall ... compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§555(b), 706(1).

[10] *See, e.g. Gordon v. Norton*, 322 F.3d 1213, 1220 (10th Cir. 2003).

89.    50 C.F.R. §13.11(c) provides that FWS will process permit applications as quickly as possible.  Inasmuch as FWS has placed a "hold" on processing elephant ESA and CITES import permit applications, the agency is in violation of its own rules.  Failure to follow its rules is per se arbitrary and capricious. This court must, pursuant to 5 U.S.C. §706(2)(A) invalidate the unlawful "hold" on the processing of elephant import applications and order FWS to expeditiously process pending and subsequently filed elephant import applications.

**Count 2.  Violation of APA Section 553(b).**

90.    FWS's "hold" constitutes an agency rule adopted without following the procedures of Section 553(b). This court must therefore declare the "hold" unlawful and set it aside as adopted "without observance of procedure required by law. 5 U.S.C. §706(2)(D).

**Count 3.  Violation of APA Section 558(c).**

91.    APA Section 558(c) requires FWS to process elephant import permit applications within a reasonable time. Pursuant to 50 C.F.R. §13.11(c), the agency itself has set the reasonable time for its processing of these applications as "as quickly as possible," and strongly implying that the applications will be processed within 90 days. *Id.* Here several of the individual Plaintiffs' applications have been pending more than two years and Plaintiff DSC is aware of similar applications pending more than three years. 5 U.S.C. §706(1) provides that the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." FWS is unlawfully withholding processing of Plaintiffs' applications and as such this court must order the agency to process Plaintiffs'

applications "as quickly as possible" and in any event, absent some articulated legitimate reason, within 90 days.

## VIII.   Pray for relief.

Wherefore Plaintiffs pray this court to grant the following relief:

(1) Declare that FWS acted arbitrarily, capriciously, and contrary to its own regulations in violation of the APA, 5 U.S.C. § 706(2)(A), by placing a "hold" on elephant import permit applications without conducting a notice and comment rulemaking proceeding;

 (2) Declare that FWS acted arbitrarily, capriciously, and contrary to the ESA, in violation of the APA, 5 U.S.C. §706(2)(A), in adopting a "hold" on the processing of elephant import applications on the basis of Presidential tweets;

(3)    Declare that FWS has violated 50 C.F.R. §13.11(c) in adopting a "hold" on processing elephant import applications.

(4)    Declare that in light of 50 C.F.R. §13.11(c), FWS's delay in the proceeding of elephant import applications is unreasonable and in violation of 5 U.S.C. §558(c);

(5)    Hold unlawful and vacate FWS's "hold" on the processing of elephant import permit applications;

(6)    Enjoin FWS from placing elephant import applications on "hold" or otherwise not processing such applications unless or until appropriate regulations have been adopted authorizing such action;

(7)     Order FWS to process pending and subsequently received elephant import applications as soon as possible in accordance with 50 C.F.R. §13.11(c) and in any event within 90 days.

(8)     Award plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

(9)     Grant plaintiffs such further and additional relief as the court may deem just and proper.

Respectfully submitted,

/s/ George L. Lyon, Jr.
George L. Lyon, Jr. (DC Bar 388678)
Bergstrom Attorneys
1929 Biltmore Street NW
Washington, DC 20009
202-669-0042
Fax 202-483-9267
gll@bergstromattorneys.com
Counsel for Plaintiffs

December 11, 2019