UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DALLAS SAFARI CLUB, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 19-cv-03696 (APM) |
| DAVID BERNHARDT, et al., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs in this case are the Dallas Safari Club, the Namibian Ministry of the Environment and Tourism, the Namibian Association of Community Based Natural Resource Management Support Organizations, and a group of individual elephant sport hunters seeking to import their sport-hunted elephant trophies into the United States (together, "Plaintiffs"). They bring this lawsuit to challenge Defendant United States Fish and Wildlife Service's failure to act on pending elephant trophy import permit applications. Now before this court is Plaintiffs' Motion for a Preliminary Injunction, in which Plaintiffs ask the court to require the Service to process pending and subsequently filed permit applications. *See* Pls.' Mot. for Prelim. Inj., ECF No. 11. Because Plaintiffs have failed to show that Defendant's inaction has irreparably harmed the organizational Plaintiffs, their members, or the individual hunter Plaintiffs, the court denies the motion for a preliminary injunction.

# I.

## A. Statutory and Regulatory Background

Two legal regimes govern the importation of sport-hunted African elephant trophies: the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.*, and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249. CITES is a multilateral treaty that aims to protect wildlife that is vulnerable to or adversely affected by commercial or non-commercial trade, which Congress has implemented into domestic law through the ESA. 16 U.S.C. §§ 1537a, 1538(c).

The ESA prohibits, among other things, importing into the United States species of fish and wildlife listed as endangered. *Id.* § 1538(a)(1). The ESA also authorizes the United States Fish and Wildlife Service ("Service") to extend those prohibitions to species of fish or wildlife listed as threatened through species-specific rulemaking. *See id.* § 1533(d); 50 C.F.R. § 17.31(c). The Service has established a permitting process to grant exceptions to some protections for threatened species. *See* 50 C.F.R. § 17.32.

The African elephant is listed as a threatened species under the ESA, *see* 43 Fed. Reg. 20,499 (May 12, 1978); 50 C.F.R. § 17.11(h), and the Service has promulgated a species-specific rule extending certain protections to the African elephant, 50 C.F.R. § 17.40(e). Notwithstanding these protections, the Service permits a sport-hunted African elephant trophy to be imported into the United States if various conditions are satisfied. 81 Fed. Reg. 36,388 (June 6, 2016); 50 C.F.R. § 17.40(e). One of these conditions is that the Service has determined "that the killing of the trophy animal will enhance the survival of the species"—this is known as an "enhancement finding"— and issued a threatened species permit under 50 C.F.R. § 17.32(a). 50 C.F.R. § 17.40(e)(6)(i)(B). This enhancement finding is made by the Branch of Permits within the Division of Management

Authority, which is part of the Service's International Affairs Program. Federal Def.'s Resp. to Pls.' Mot. for Preliminary Inj., ECF No. 16 [hereinafter Def.'s Opp'n], Ex. A, ECF No. 16-1 [hereinafter Alvarez Decl.], ¶ 7.

The ESA also prohibits any trade in animal specimens that violates CITES, a multilateral treaty—of which the United States is a signatory—that regulates international trade of various species through a system of permits and certificates. 16 U.S.C. § 1538(c)(1); CITES, Art II. The African elephant is included among the species whose trade is regulated by CITES. Though the process differs slightly depending upon the country of origin, generally speaking, African elephant specimens may be shipped internationally under CITES so long as the exporting country issues a permit and the permit accompanies the specimen and is presented for validation at the time of trade. CITES, Art. IV, ¶¶ 2, 4. In some instances, an import permit is also required. The import permit requires the importing country to find that trade in the specimen will be for purposes which are not detrimental to the survival of the species involved ("non-detriment finding"), Art. III, ¶ 3(a), and that the specimen is not to be used for primarily commercial purposes, Art. III, ¶ 3(c); *see also* 50 C.F.R. § 23.61 (listing factors to be considered in issuing a non-detriment finding); *id*. § 23.62 (listing factors to be considered in making a finding of not for primarily commercial purposes). The Branch of Permits within the Service is responsible for making the required findings and issuing or denying the CITES import permit. Alvarez Decl. ¶ 11.

B. **Factual Background**

To recap, all African elephant trophy imports require the Service to make an enhancement finding and issue an ESA permit. In addition, certain African elephant trophy imports also require a non-detriment finding and CITES import permit. Historically, the Service made periodic countrywide enhancement findings and non-detriment findings, as appropriate, which applied to

3

all sport-hunted elephant trophies taken in the particular country during specific time periods. *See* Alvarez Decl. ¶ 16.

Such periodic determinations came to a halt, however, according to Plaintiffs, due to a "Presidential tweet[]." Pls.' Mem. of P. & A in Support of Mot. for Prelim. Inj., ECF No. 11-1 [hereinafter Pls.' Mot.], at 5. The tweet at issue was preceded by the Service's decision to lift the suspension on Zimbabwe's ESA enhancement finding, which had been imposed in 2014. Pls.' Mot. at 10–11, 14. In a Federal Register Notice dated November 17, 2017, the Service announced the enhancement finding as to Zimbabwe for elephants taken on or after January 21, 2016; indicated it would make a new enhancement finding at the start of 2019 for, at least, the 2019 hunting season; and stated that it would review import applications "on a case-by-case basis." 82 Fed. Reg. 54,405, 54,405–08 (Nov. 17, 2017). According to Plaintiffs, "[t]he decision to lift the suspension on elephant imports gathered spontaneous criticism in the media." Pls.' Mot. at 15. The media storm prompted President Trump to tweet on the same day, November 17, 2017: "Put big game trophy decision on hold until such time as I review all conservation facts. Under study for years. Will update soon with Secretary Zinke. Thank You!" Donald J. Trump (@realDonaldTrump), Twitter (Nov. 17, 2017).[1] Two days later, President Trump again tweeted: "Big-game trophy hunting decision will be announced next week but will be very hard pressed to change my mind that this horror show in any way helps conservation of Elephants or any other animal." Donald J. Trump (@realDonaldTrump), Twitter (Nov. 19, 2017).[2] As a result of the President's proclamations, Plaintiffs contend, "[n]o elephant import permit from any country has been processed, issued or renewed since that first tweet on November 17, 2017." Pls.' Mot. at 16.

---

[1] Available at https://twitter.com/realdonaldtrump/status/932397369655808001.
[2] Available at https://twitter.com/realdonaldtrump/status/932397369655808001.

Meanwhile, the Service's prior negative enhancement findings for Zimbabwe in 2014 and 2015 were under attack in litigation. In 2016, a district court rejected the argument that those findings were invalid because they were adopted without notice and comment. *See Safari Club Int'l v. Jewell*, 213 F. Supp. 3d 48, 62 (D.D.C. 2016). But in December 2017, the D.C. Circuit reversed, finding that the countrywide enhancement findings at issue constituted rules under the Administrative Procedure Act ("APA") and thus were subject to the requirement of notice and comment. *See Safari Club Int'l v. Zinke*, 878 F.3d 316, 332–36 (D.C. Cir. 2017). The court "remand[ed] the case to the Service so that it [could] initiate rule making to address enhancement findings for the time periods at issue." *Id.* at 336. In response to that ruling, the Service issued a memorandum announcing withdrawals of various countrywide findings and explaining that "[a]t this time . . . [the Service] intends to grant or deny permits to import a sport-hunted trophy on a case-by-case basis." Def.'s Opp'n at 7–8 (quoting Def.'s Opp'n, Ex. B, ECF No. 16-2, at 2–3). The Service concedes that, since issuing this memorandum, it has "worked on reviewing [trophy permit] applications, but has not issued any final determination on these pending applications." *Id.* at 8.

C.     **Procedural History**

Plaintiffs filed this suit on December 11, 2019. Compl., ECF No. 1. Two months later, Plaintiffs moved for preliminary injunctive relief. *See* Pls.' Mot. for Prelim. Inj., ECF No. 11. Specifically, they ask this court to "issue an injunction requiring [Defendant] to expeditiously and in no event later than 90 days process all pending applications for elephant import permits and subsequently received applications." Pls.' Mot. at 43. For the reasons that follow, the court denies Plaintiffs' motion.

## II.

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations and internal quotation marks omitted). A court may only grant the "extraordinary remedy . . . upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). The movant's burden is still higher where, as here, the movant's requested "injunction is mandatory— that is, [ ] its terms would alter, rather than preserve, the *status quo* by commanding some positive act." *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (quoting *Electr. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014)). Courts in this Circuit have required the party seeking such a mandatory injunction to "meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Id.* (quoting *Electr. Privacy Info. Ctr.*, 15 F. Supp. 3d at 39).

Specifically, a plaintiff must show that: (1) it "is likely to succeed on the merits"; (2) it "is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted). In this jurisdiction, courts evaluate the four preliminary injunction factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009). *Winter,* however, called that approach into question and sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors without discounting the importance of a factor simply because one or more other factors have been convincingly

established.  *See Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that the D.C. Circuit "has not yet decided whether *Winter* . . . is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").

Regardless of whether the sliding scale framework applies, a movant must at minimum demonstrate irreparable harm, which has "always" been "[t]he basis of injunctive relief in the federal courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959)); *see also Younger v. Harris*, 401 U.S. 37, 46 (1971) (noting that irreparable injury is "the traditional prerequisite to obtaining an injunction").  "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Indeed, if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors.  *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

A number of principles apply when evaluating whether an alleged harm is "irreparable." First, "the injury must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  The party seeking relief must show that the complained-of injury is so imminent that there is a clear and present need for equitable relief.  *Id*. Second, the movant must "substantiate the claim that irreparable injury is 'likely' to occur." *Id*. (citation omitted). That means a party cannot rely on bare allegations of harm, but instead must come forward with "proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Id*.  Third, the moving party

must establish causation. That is, it "must show that the alleged harm will directly result from the action which the movant seeks to enjoin." *Id.*

### III.

The court finds that injunctive relief is not warranted because Plaintiffs have failed to show irreparable harm as to any Plaintiff. Accordingly, the court need not consider any of the other preliminary injunction factors. *See CityFed Fin. Corp.*, 58 F.3d at 747; *Sataki v. Broad. Bd. of Governors*, 733 F. Supp. 2d 22, 48 (D.D.C. 2010).

A. **The Individual Plaintiffs' Claims**

In support of their motion for a preliminary injunction, Plaintiffs provide declarations from sport hunters and individual Plaintiffs Larry Atlas Cheek, Joe Lane Easter, Daniel Crippen, and David Crippen. *See* Pls.' Mot., Ex. 2, ECF No. 11-3 [hereinafter Hunters' Decl.]. They also submitted the declaration of Donald Troy Moritz, who is not a named Plaintiff but a member of organizational Plaintiff Dallas Safari Club. *See* Pls.' Mot., Ex. 10, ECF No. 11-11 [hereinafter Moritz Decl.]. Plaintiffs argue that each of the individual hunters is "being denied the trophies from their hunts, resulting in both emotional and monetary injury." Pls.' Mot. at 28. None, however, makes out irreparable harm.

As an initial matter, both Cheek and Moritz lack standing to challenge the Service's inaction, as neither has a pending import permit application. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (explaining that a plaintiff "bears the burden of showing that he has standing for each type of relief sought"); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990) (Blackmun, J., dissenting) (noting that, when seeking a preliminary injunction, the movant's burden to demonstrate standing "will normally be no less than that required on a motion for summary judgment" (internal quotation marks and citation omitted)). While Cheek submitted

a trophy import permit application in April 2017, the Service denied his application in July 2017, *see* Def.'s Opp'n, Ex. C, ECF No. 16-3, at 24–25, and he does not appear to have submitted another. Similarly, according to agency records, Moritz does not have a pending application. Def.'s Opp'n at 15 n.6. Plaintiffs do not contest these fact assertions, *see generally* Pls.' Mem. of P. & A. in Reply to the Government's Resp. to Mot. for Prelim. Inj., ECF No. 17, so the court accepts them as true. As neither Cheek nor Moritz has a pending application or represents that he will submit a new application, the relief each seeks would not remedy any actual injury either is suffering. Accordingly, they both lack standing to bring a claim against Defendant.

### 1. *The hunter Plaintiffs' emotional harm*

The remaining hunter Plaintiffs—Joe Lane Easter, Daniel Crippen, and David Crippen—do have pending applications, and so the court turns to their claimed injuries. Each Plaintiff states that the Service's failure to process his application has caused him "great anguish," because each has been unable to "bring back the trophy from [his] hunt and . . . [the Service] can give [him] no information as to when, if ever, [his] import permit application will be processed." Hunters' Decl. at 2–5. But the hunters' claimed emotional injuries, as presented, do not rise to the level of irreparable harm. Plaintiffs' statements are contained in identically worded, four-paragraph declarations, which provide no detail about how the stalled processing of their applications has individually affected them. The boilerplate and conclusory quality of these declarations undercuts their claims of "great" harm.

But even assuming "the sincerity of declarants' disappointment," "the inability to import elephant trophies does not result in a 'certain and great' harm," *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 34 (D.D.C. 2014), much less an irreparable one, *see League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). "Notwithstanding the 'great emotional significance'

of an elephant trophy," the Plaintiff hunters have already "engage[d] in the core recreational activity of hunting." *Safari Club*, 47 F. Supp. 3d at 35. They do not complain of any impairment of activities resulting from the delay in processing their permit applications. *Cf. Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 213–14, 219–22 (D.D.C. 2003) (describing the irreparable aesthetic harm that the organizational plaintiff would experience at the killing of 525 mute swans because its members "regularly observe, photograph, and study mute swans"). Additionally, Plaintiffs were on notice that their applications could take a significant amount of time to process. The Service's regulations state that "[t]he Service will process all applications as quickly as possible," but that "we cannot guarantee final action within the time limit you request." 50 C.F.R. § 13.11(c). Plaintiffs' disappointment in delayed processing, while understandable, is diminished because delay was always a possibility. Finally, Plaintiffs' emotional distress will be alleviated when the Service issues a decision granting or denying their permit applications, and thus it cannot be said that the harm they face is "irreparable." *Cf. League of Women Voters*, 838 F.3d at 9 (finding that organization's mission was harmed because "after the registration deadlines for the November election pass, there can be no do over and no redress" (internal quotations removed)).

At bottom, Plaintiffs' distress is not the sort of extreme emotional distress that might warrant the extraordinary relief of a preliminary injunction. *Cf. Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220 (D.D.C. 2015) (recognizing that emotional distress might rise to irreparable harm where the claimed injury is observing the killing of a large number of animals).

### 2. The hunter Plaintiffs' economic harm

The hunter Plaintiffs also claim economic harm, and here their argument is two-fold. First, Plaintiffs allege that the hunter Plaintiffs have incurred expenses through their travels to Africa, "obtaining the necessary permits to hunt an elephant, hiring guides, effecting the hunt and in

10

preserving his or her trophy." Pls.' Mot. at 28. These "injuries," however, are costs that the individual Plaintiffs sustained *before* any delay in receiving an import permit. Thus, these costs cannot have been caused by any action or inaction on Defendant's part.

Plaintiffs' second economic harm argument is that the hunter Plaintiffs face the "additional irreparable injury resulting from risk of loss due to theft . . . as well as the risk that ivory from legally taken elephants may be diverted to the black market." *Id.* at 29. They also cite the rising cost of storing their trophies abroad. *Id.*

Here, too, Plaintiffs fall far short of the necessary showing of irreparable harm. None of the hunter Plaintiffs claims to be actually paying additional costs for storing his trophy. Only Moritz offered evidence of paying fees for the "monthly warehousing" of his trophies, *see* Moritz Decl. at 7, but he has no pending application, so his costs cannot be attributed to the Service's alleged inaction. Plaintiffs also offer a declaration from Debbie Peake, the owner of a taxidermy shop in Botswana, who asserts that her facility will soon have to charge clients for the storage of elephant trophies because the delay in obtaining approval to ship the stored trophies increases the risk of theft. *See* Pls. Mot., Ex. 4, ECF No. 11-4. But Plaintiffs offer no evidence that any hunter Plaintiff or any member of an organizational Plaintiff stores his or her trophy with Peake's company and thus will face increased fees or the heightened risk of theft. Thus, Peake supplies no evidence to establish irreparable harm as to *these* Plaintiffs.

But even assuming that record evidence supported Plaintiffs' claims as to the storage fees and the risk of theft, Plaintiffs' argument would fare no better. Courts in this Circuit have recognized that economic loss can constitute irreparable injury only in limited circumstances: where "monetary loss . . . threatens the very existence of the movant's business," *Wis. Gas Co.*, 758 F.2d at 674, or where the claimed economic loss is unrecoverable, *Nat'l Mining Ass'n v.*

11

*Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011). And, although Plaintiffs in this case claim their losses would be unrecoverable because their claims arise under the APA, this fact "does not, in and of itself, compel a finding of irreparable harm." *Id.* Rather, the harm must be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000). The anticipated injury here—paying more in fees—"do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction." *Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) (finding that the forced sale of a house, boat, or stock does not amount to irreparable harm). Nor are Plaintiffs' allegations as to the risk of theft enough absent corroborating evidence, since "[b]are allegations of what is likely to occur are of no value." *Wis. Gas Co.*, 758 F.2d at 674. The speculative threat of theft is not of such imminence that there is a "a 'clear and present' need" for equitable relief. *Id.*; *see also Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 113 (D.D.C. 2015) (finding no irreparable harm where plaintiffs challenged a final rule that would allow spouses of certain aliens to apply for employment authorization but failed to show "with sufficient certainty" that the rule would result in increased job competition).

\* \* \*

In sum, the court concludes that neither the individual hunter Plaintiffs' alleged emotional injuries nor their alleged economic injuries are sufficient to warrant the extraordinary relief of a mandatory preliminary injunction.

B. **Organizational Plaintiffs' Claims**

With respect to the organizational Plaintiffs— Dallas Safari Club ("DSC"), the Namibian Ministry of the Environment and Tourism ("MET"), and the Namibian Association of Community Based Natural Resource Management Support Organizations ("NASCO")—Plaintiffs argue that

12

these organizations are suffering "irreparable harm derivatively." Pls.' Mot. at 29. The organizational Plaintiffs' primary contention is that the Service's delay in processing permit applications will decrease the popularity of sport hunting in Africa, resulting in a decrease in funding for conservation efforts and ultimately a detrimental impact on "efforts to support the recovery of African elephants and other endangered and threatened species in the elephant range countries." *Id.* at 29–42. Plaintiffs offer declarations from the heads of two of the three organizational Plaintiffs, who testify that Defendant's "hold on the processing of elephant import permits causes irreparable injury . . . because it impedes the full recovery of the threatened African elephant population," Pls.' Mot., Ex. 5, ECF 11-6 [hereinafter Mason Decl.], ¶ 4, and that Defendant's "failure . . . to grant elephant trophy import permits is undermining Namibia's conservation incentive mechanisms," Pls.' Mot., Ex. 7, ECF No. 11-8 [hereinafter Shifeta Decl.] ¶ 18. Based on these declarations, Plaintiffs maintain that they have shown irreparable harm.

The court is not persuaded. First of all, Plaintiffs again fall well short of supporting their claims with proof. *See Wis. Gas Co.*, 758 F.2d at 674 ("[M]ovant must provide *proof* that the harm has occurred in the past and is likely to occur again, or *proof* indicating that the harm is certain to occur in the near future." (emphasis added)). Plaintiffs assert, citing the declaration of Executive Director Corey Mason, that Plaintiff DSC is injured by Defendant's delay in processing the permit applications because the "delay undoubtedly results in decreased membership to the organization." Pls.' Mot. at 30. But Mason makes no representation at all about decreased membership. *See generally* Mason Decl. Mason's representation as to DSC members is that the Service's delay in processing permit applications "injures [DSC] members who have spent hundreds of thousands of dollars in conducting hunts in Africa," *id.* ¶ 2—again, an economic loss undertaken by DSC members that is not caused by any action or inaction by Defendant.

13

Likewise, with respect to MET and NASCO, Plaintiffs contend that "studies have shown that most conservancies will shortly fail if elephant import permits are not processed," Pls.' Mot. at 36, but they offer no evidence to support these representations. At the first step of their speculative chain, Plaintiffs have provided no evidence that the suspension of elephant trophy permits has decreased the popularity of sport hunting in these regions. At the second step, Plaintiffs provide no evidence that any decrease in hunting has affected funding received by the conservation groups. MET Minister Pohamba Shifeta avers that "[h]unting contributed approximately 46% of the total cash income to conservancies in 2018," Shifeta Decl. ¶ 7, yet provides no comparable data from prior years by which this court could assess whether President Trump's 2017 tweet and the Service's subsequent suspension of processing permit applications has had a negative impact on cash income it received. And Plaintiffs provide no evidence at all from NASCO as to how the suspension of permits has caused it programmatic or economic injury.

Furthermore, even assuming Plaintiffs had shown that the Service's inaction in processing permits resulted in decreased funding to NASCO and MET, as explained, "the standard for showing irreparable harm in this jurisdiction is strict, and economic harm alone is generally not sufficient to warrant this [c]ourt's granting of a motion for a preliminary injunction." *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 120 (D.D.C. 2012). In *Safari Club*, for example, the plaintiffs sought to enjoin the enforcement of a final rule that would remove a regulation exempting three antelope species from many ESA prohibitions, thereby requiring permits for sport hunting the antelope. *Id.* at 104, 108. Much like the Plaintiffs here, Safari Club International argued that "[t]he reality of conservation is that it is dependent upon funding," and offered declarations from wildlife ranchers who anticipated substantial economic loss resulting from the final rule. *Id.* at 119. The court found this showing of alleged irreparable harm inadequate: "While the plaintiffs have

demonstrated that they are facing or may face significant economic loss, they have not demonstrated that the existence of their businesses is imperiled" by the decrease in hunting and any resulting loss in the economic value of ranching the antelope species. *Id.* at 120. So, too, in this case. None of the organizational Plaintiffs alleges, much less demonstrates, that the anticipated loss in revenue "threatens the very existence of the movant's business." *Id.* (quoting *Wis. Gas Co.*, 758 F. 2d at 674); *see also Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (finding that plaintiff failed to demonstrate irreparable harm where declarant mentioned his company's lost revenues and predicted that he "will be out of business within [eighteen] months" because the declaration failed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, or explain with any specificity how he arrived at the conclusion that he would be forced out of business in eighteen months").

Accordingly, the court finds that the organizational Plaintiffs have failed to demonstrate that they face irreparable harm absent a preliminary injunction.

## IV.

Prior to concluding, the court notes that two additional considerations militate against issuing a preliminary injunction in this case. The first is Plaintiffs' delay in seeking preliminary injunctive relief. Courts in this jurisdiction have found that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005). The D.C. Circuit has held that a delay of forty-four days before bringing action for injunctive relief was "inexcusable," and "bolstered" the "conclusion that an injunction should not issue," particularly where the party seeking an injunction had knowledge of the pending nature of the alleged irreparable harm. *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975). Here,

15

the hunter Plaintiffs participated in their respective hunts in August 2017, Hunters' Decl. at 2–4, and they allege that their permit applications have been pending for over two years because of President Trump's November 2017 tweet, Compl. ¶¶ 58–59. Yet, Plaintiffs did not file this lawsuit until December 11, 2019, *see* Compl., and did not move for injunctive relief until February 4, 2020, *see* Pls.' Mot. for Prelim. Inj. Such a substantial delay stands in stark contrast to the high bar Plaintiffs must clear to show irreparable harm. *See, e.g.*, *Frizzell*, 530 F.2d at 987; *Mylan Pharms.*, 81 F. Supp. 2d at 44 (noting that delay of over two months in bringing action for injunctive relief "militates against a finding of irreparable harm"); *Delmatoff, Gerow, Morris Langhans, Inc. v. Children's Hosp. Nat'l Med. Ctr.*, CIV. A. No. 89–0219, 1989 WL 168856, at *3 (D.D.C. May 3, 1989) (finding, in a trademark action, that "a substantial delay in moving for a preliminary injunction indicates that no irreparable harm will result if such relief is denied").

Second, the court cannot ignore the current COVID-19 pandemic and the particular hardship a mandatory injunction would impose in the present situation. On March 11, 2020, the World Health Organization publicly characterized COVID-19 as a pandemic. CENTERS FOR DISEASE CONTROL AND PREVENTION, Coronavirus Disease 2019 (COVID-19): Situation Summary (updated April 7, 2020).[3] On March 13, 2020, the President declared a National Emergency in an effort to address the spread of COVID-19. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Pres. Proc. No. 9994, 85 Fed. Reg. 15337, 2020 WL 1272563 (Mar. 13, 2020). On March 16, 2020, the President announced new guidance to slow the spread of the virus, including limiting the gathering of groups to no more than 10 people and working or schooling from home whenever possible, OFFICE OF THE PRESIDENT OF THE

---

[3] Available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.

UNITED STATES, *The President's Coronavirus Guidelines for America*, (Mar. 16, 2020),[4] and on March 29, 2020, he extended those guidelines at least until the end of April, OFFICE OF THE PRESIDENT OF THE UNITED STATES, *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, (Mar. 29, 2020).[5]

The Office of Personnel Management has also been issuing guidance concerning the continuity of Federal Government operations, including recommendations that agencies permit employees to telework. *See* Dale Cabaniss, UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, *Memorandum for: Heads of Executive Departments and Agencies. Subject: Coronavirus Disease 2019 (COVID-19); Additional Guidance*, (Mar. 7, 2020).[6] The Office of Management and Budget has asked agencies to "offer maximum telework flexibilities to all current telework eligible employees, consistent with operational needs of the departments and agencies as determined by their heads." *See* Russel T. Vought, EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF MANAGEMENT AND BUDGET, *Updated Guidance for National Capital Region on Telework Flexibilities in Response to Coronavirus, Memorandum from the Acting Director of The Office of Management and Budget to the Heads of Departments and Agencies*, (Mar. 15, 2020).[7]

In light of the unprecedented disruptions created by the COVID-19 pandemic and the Service's likely diminished capacity to process permit applications during this period—particularly given Defendant's representation that "[r]endering enhancement and non-detriment findings on a case-by-case basis is a time consuming and resource intensive process," Def.'s Opp'n

---

[4] Available at https://www.whitehouse.gov/wpcontent/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.
[5] Available at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-14/.
[6] Available at https://chcoc.gov/content/coronavirus-disease-2019-covid-19-additional-guidance.
[7] Available at https://www.chcoc.gov/content/updated-guidance-national-capital-region-telework-flexibilities-response-coronavirus.

at 36—this court finds it particularly unwise and not in the public interest to order the expeditious processing of sport trophy permit applications during this time.

V.

For the foregoing reasons, the court denies Plaintiffs' Motion for a Preliminary Injunction, ECF No. 11.

Dated: April 9, 2020

Amit P. Mehta
United States District Court Judge